T.C. Memo. 2000-335


UNITED STATES TAX COURT


ALRON ENGINEERING & TESTING CORP., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8272-99.                    Filed November 1, 2000.


<u>Mark M. Camp</u>, for petitioner.

<u>Mark J. Miller</u> and <u>Christa A. Gruber</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GOLDBERG, <u>Special Trial Judge</u>:  Respondent determined deficiencies in petitioner's Federal income tax of $3,618 and $3,976 for the taxable years ended June 30, 1995, and June 30, 1996, respectively.  Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue.

The sole issue in this case is whether petitioner is a

qualified personal service corporation under section 448(d)(2), and therefore subject to the flat 35-percent tax rate pursuant to section 11(b)(2).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner's principal place of business was Menomonee Falls, Wisconsin.

Petitioner is a Wisconsin corporation licensed by the State and engaged in the business of providing geotechnical testing and engineering services. Petitioner is described as a geotechnical testing and engineering firm on the corporate annual reports filed with the State of Wisconsin. Petitioner also files, at least biannually, a report with the Architects and Engineers Registration. During the taxable years in issue, petitioner employed two engineers, Allan F. Huseth (Mr. Huseth) and Jeffrey Smith (Mr. Smith), and approximately ten non-engineering personnel, including technicians and clerical staff. Mr. Huseth, the president of petitioner and 100-percent owner of petitioner's stock during the years in issue, is a registered professional engineer in the State of Wisconsin since 1971, with a bachelor of science degree in civil engineering and a master of science degree with a specialty in soil mechanics and highway

engineering.  Mr. Smith holds a 4-year degree in civil engineering and a master's degree in soil mechanics.

Technicians on petitioner's staff were given a variety of duties, including operating equipment, e.g., drilling, creation of cylinders and other test samples, laboratory testing, and field testing.  The educational background of petitioner's non-engineering staff ranged from employees with a 2-year degree[1] in civil engineering to a few with high school diplomas.  One employee did not receive a high school diploma.  All of petitioner's employees worked full-time during the years in issue.

Petitioner's geotechnical testing services consisted primarily of physical tests of concrete and soil samples conducted in either the field or laboratory.  Petitioner provided necessary equipment (e.g., drill rigs), and laboratory facilities, including a "moist curing room" where concrete specimens were cured until the required "specification date".  Operation of equipment out in the field or laboratory did not require basic knowledge of mathematics or engineering principles since it was not analytical in nature.  Training of petitioner's technical employees, or technicians, occurred on the job.

---

[1]  A 2-year degree in civil engineering is not the equivalent of an engineering degree required to perform professional engineering services in Wisconsin.  See Wis. Stat. sec. 443.04 (1999).

Concrete testing consisted of primarily compressions tests to check specifications and density of freshly poured concrete in the field. Tests were conducted on concrete core samples or 6 x 12 cylinders created by petitioner's technicians or brought in by third party contractors.

Petitioner also tested soil samples for moisture contents, density determinations, shear strengths, permeability tests, proctor tests, and other tests. Soil borings, and sometimes rock core borings, were obtained to classify the type of soil or rock substance. To conduct a soil density test technicians in the field used nuclear meters to determine the density of materials for earthwork projects. Training to read the meter was done on the job in approximately 30 minutes. Technicians handled all aspects of obtaining samples, drilling, or laboratory testing.

In both concrete and soil testing, information collected from a test was given to clerical staff. Upon request by a client, an engineering analysis could be generated from the test results. Otherwise, the data was given to the client in a report written by the clerical staff without analysis. Only technical personnel conducted and collected data from geotechnical tests. It was not the function of the engineers to create or test the cylinders or core samples.

Petitioner also provided engineering services. Engineering services included offering recommendations on types of

foundations or supporting structures, bridges, and buildings, or pavement design from samples. In an engineering analysis, a professional engineer reviews, studies, and analyzes information from field logs and laboratory data to recommend the type of foundations of the structure or the best options available. Analyses are based upon data collected by petitioner's technicians or provided by third party soil testing companies. In order for petitioner to provide engineering services, the client must request it.

Engineering services were billed at a rate between $80 and $110 per hour, depending on the precise service rendered. Billing for geotechnical testing depended on the type of testing requested, the parts required to create samples, and the hourly rate for technicians, which was lower than the hourly rate for engineers.

Petitioner's clientele may request geotechnical testing or engineering analysis, or both. For instance, other structural or geotechnical engineering firms have hired petitioner for the sole task of providing them with test samples and results from the field or laboratory. These clients conduct their own engineering analysis of the data provided by petitioner's test reports.

Petitioner maintained its books and records to reflect the type of service, whether engineering or geotechnical testing, by using account numbers. Every job billed to a client had an

associated account number and short narrative to distinguish the type of service rendered and billed. The accounts range from 5001 to 5010. Accounts 5001 through 5006 and 5008 through 5010 relate to geotechnical services, including field and laboratory technician services and field soil boring services. Only accounts 5006 and 5007 relate to engineering services, including both office and field engineering services.

During the taxable years ended June 30, 1995, and June 30, 1996, petitioner used the graduated tax rates under section 11(b)(1) to determine its corporate tax liability. In a notice of deficiency respondent determined that petitioner was a qualified personal service corporation under section 448(d)(2), thereby requiring a flat tax rate of 35 percent under section 11(b)(2).

## OPINION

Respondent contends that engineering and geotechnical testing are both services within the field of engineering, and therefore petitioner is a qualified personal service corporation as defined in section 448(d)(2).

Petitioner contends that it is not a qualified personal service corporation because geotechnical testing is not in the field of engineering. Furthermore, petitioner argues that it did not perform "substantially all" of its services within the field of engineering as defined under section 448(d)(2).

Section 448(d)(2) defines a "qualified personal service corporation" as any corporation:

(A) substantially all of the activities of which involve the performance of services in the fields of health, law, engineering, architecture, accounting, actuarial science, performing arts, or consulting, and

(B) substantially all of the stock of which (by value) is held directly (or indirectly through 1 or more partnerships, S corporations, or qualified personal service corporations not described in paragraph (2) or (3) of subsection (a)) by--

(i) employees performing services for such corporation in connection with the activities involving a field referred to in subparagraph (A),

(ii) retired employees who had performed such services for such corporation,

(iii) the estate of any individual described in clause (i) or (ii), or

(iv) any other person who acquired such stock by reason of the death of an individual described in clause (i) or (ii)(but only for the 2-year period beginning on the date of the death of such individual).

Under section 11(b)(2), the income of a personal service corporation is taxed at a rate of 35 percent.

To qualify as a personal service corporation, a corporation must satisfy the function and ownership tests under the regulations. Sec. 1.448-1T(e)(3), (4) and (5), Temporary Income Tax Regs., 52 Fed. Reg. 22768 (June 16, 1987), as amended by T.D. 8329, 56 Fed. Reg. 485 (Jan. 7, 1991), T.D. 8514, 58 Fed. Reg. 68299 (Dec. 27, 1993). Since petitioner concedes that all of its stock is owned by its employee, Mr. Huseth, the ownership test is

satisfied. To satisfy the function test, substantially all of the corporation's activities must involve the performance of services in the field of engineering. See id.

As a threshold matter, petitioner must provide services in the field of engineering. Although petitioner concedes that it does provide engineering services which are clearly in the field of engineering, petitioner contends that geotechnical testing is not within the field of engineering. We agree with petitioner. Geotechnical testing does not require the same education, training, and mastery as engineering.

According to Wisconsin law, a professional engineer licensed with the State must meet certain minimum education, experience, and examining board requirements.[2] This is not the case for technicians who perform geotechnical testing services. There are no standard minimum requirements to provide geotechnical testing services under the laws of Wisconsin. According to Mr. Huseth's

---

[2] The basic minimum requirements are as follows: (1) A diploma or certificate from an engineering school or college approved by the examining board of not less than 4 years together with an additional 4 years of experience in engineering work; or (2) a specific record of 8 or more years of experience in engineering work indicating that the applicant is competent to be placed in responsible charge of such work; or (3) a specific record of 12 years or more of experience in engineering work indicating that the applicant is competent to practice engineering, or (4) a diploma or certificate from an engineering school or college approved by the examining board of not less than 4 years, together with an additional 8 years of experience in engineering work, all satisfactory to the examining board. Wis. Stat. sec. 443.04 (1999).

testimony, technicians are trained on the job and do not require a minimum education standard to operate equipment or gather test data. Equipment or laboratory training may be completed in as long as a single day or in as little as a half hour. Moreover, technicians are not bound by State or board licensing or review.

Petitioner's geotechnical testing services are separate and distinct from petitioner's engineering services. The essence of engineering services is in the application of mathematical, physical, and engineering sciences to services or projects, such as consultation, investigation, evaluation, planning, design, and review of structures and buildings. Although geotechnical testing data may be used in petitioner's engineering analysis, the data may be used for other purposes and by other parties as well. When petitioner provides an engineering analysis, the data may be supplied by the client or petitioner. In the alternative, petitioner may supply data from geotechnical testing services without rendering any professional engineering services. Although we agree with respondent that engineering services could not be completed without the data provided from geotechnical testing, whether that information was furnished by petitioner or another geotechnical testing firm, we are not persuaded to find that sufficient reason to deem the means of providing data under the umbrella of "engineering". In practice and principle the two

lines of services may function mutually exclusively.[3]

Section 448(d)(2)(A) requires that "substantially all" of petitioner's activities must be devoted to the field of engineering. Under section 1.448-1T(e)(4)(i), "substantially all" is defined as 95 percent or more of the employees' time devoted to the performance of services within the field of engineering. The temporary regulation further provides that for purposes of determining whether the 95-percent rule is satisfied, the performance of any activity incident to the actual performance of engineering services is considered the performance of services in that field.

Respondent contends that geotechnical testing is "incident to" the qualifying field of engineering. The temporary regulation states that activities incident to the performance of services in a qualifying field include the supervision of employees engaged in directly providing services to clients, and the performance of administrative and support services incident to such activities. Sec. 1.448-1T(e)(4)(i), Temporary Income Tax Regs., 52 Fed. Reg. 22768 (June 16, 1987), as amended by T.D. 8329, 56 Fed. Reg. 485 (Jan. 7, 1991), T.D. 8514, 58 Fed. Reg. 68299 (Dec. 27, 1993). In this case, geotechnical testing of soils and concrete is not within the field of engineering, nor is

---

[3] During his testimony, Mr. Huseth referred to three other geotechnical testing companies in the area that did not employ any engineers on their staffs.

it "incident to" engineering. Petitioner's geotechnical testing services are not dependent upon petitioner's ability to provide engineering services. It was not unusual for clients to request petitioner's geotechnical testing services exclusive of a subsequent engineering analysis. In the alternative, an engineering analysis may be completed by data furnished by a third party, not necessarily petitioner's own geotechnical testing department. Specific services provided by petitioner varied depending upon the unique request of the client. Moreover, administrative and support services provided for engineering analyses may be separated from the administrative and support services provided for geotechnical testing services.

Since we have decided that geotechnical testing is not in the field of engineering, a qualifying service, then we must next decide how much of petitioner's time was spent in petitioner's engineering services. According to the temporary regulation, substantially all or 95 percent of petitioner's employees' time must be devoted to rendering a qualifying service under section 448(d)(2).

Petitioner proffered evidence demonstrating the overall breakdown of testing and engineering services rendered during the years in issue by dollar amounts reflected in invoices. From the invoices in the record, we find that petitioner's engineering services were billed between $80 and $110 per hour, depending on

the type of engineering service rendered. Although the invoices reflect a mix of work, both geotechnical and engineering services, we can reasonably distinguish, by use of the account numbers, the proportionate time spent in engineering and geotechnical testing. We find petitioner spent more than 5 percent of its time on geotechnical services. Since geotechnical testing is separate and distinct from the field of engineering, petitioner does not meet the function test as required under section 448(d)(2). In our review and analysis of Exhibits 7 through 11,[4] it is reasonable to conclude that 95 percent of petitioner's time was not devoted in the field of engineering or incident to the field of engineering.

We find petitioner is not a qualified personal service corporation under section 448(d)(2), and therefore not subject to the 35-percent flat tax rate.

---

[4] Exhibit 7 is a Record of Invoices Billed from June 30, 1994, through Dec. 31, 1994.

Exhibit 8 is a Record of Invoice Billed from Jan. 4, 1995, through Dec. 31, 1995.

Exhibit 9 is a Record of Invoice Billed from Jan. 4, 1996, through July 17, 1996.

Exhibit 10 is a sample of petitioner's invoices dated throughout the years in issue, showing the account numbers for services rendered.

Exhibit 11 is a breakdown of sales totals from July 1994 through June 1995, and also from July 1995 through June 1996. This summary is based upon the account numbers petitioner followed in bookkeeping. This exhibit also includes the job descriptions associated with account numbers.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.